588 A.2d 1343

**Anthony GEONNOTTI, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING, Appellee.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 20, 1990.

Decided April 2, 1991.

Anthony R. Geonnotti, Sr., Feasterville, for appellant.

Timothy P. Wile, Asst. Counsel-in-Charge of Appellate Section, with him, Harold H. Cramer, Asst. Chief Counsel, and John L. Heaton, Chief Counsel, King of Prussia, for appellee.

Before SMITH and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

Anthony R. Geonnotti, Sr. (Geonnotti) appeals an order of the Court of Common Pleas of Bucks County, dismissing his appeal from the suspension of his driver's license by the Department of Transportation, Bureau of Driver Licensing (PennDOT), for refusing to submit to a blood alcohol test

pursuant to Section 1547(b) of the Vehicle Code (Code), 75 Pa.C.S. 1547(b).[1]  We affirm.

At about 5:00 p.m. on March 1, 1988, a Bensalem Township Police Officer (Barry) observed Geonnotti's car with its engine running parked on private property near a roadway. The officer approached the vehicle and found Geonnotti, who appeared to be unconscious, pitched slightly to the right on the driver's side.  The officer observed that Geonnotti had bloodshot eyes, his speech was slurred and mumbled, and noticed an odor of alcohol on his breath.  Officer Barry asked Geonnotti to exit his car and submit to a pre-arrest breath test and other field sobriety tests.  He advised Geonnotti that he would lose his license for one year if he did not take the test.  Geonnotti refused.  Officer Barry advised Geonnotti that he was under arrest.  A back-up police officer arrived and ordered Geonnotti out of his car. Geonnotti complied with the order and exited his vehicle. Geonnotti was searched, handcuffed and taken to the township's police headquarters by Officer Barry.

At police headquarters, another police officer, (Cappellone) advised Geonnotti of his implied consent rights,[2] specifically advising him that his license would be suspended for one year if he refused to submit to chemical testing. Geonnotti initially agreed to take the test, but then withdrew his consent, requesting that he have an opportunity to first confer with his son whom he heard in the hallway. The police officer then completed and signed a form indicating that Geonnotti refused to take the test.  The conversation between the police officer and Geonnotti occurred at

1.  Section 1547(b) of the Code provides for a suspension of a driver's license for one year upon a licensee's refusal to submit to chemical testing to determine blood alcohol content.

2.  Officer Barry testified that he was present in the bench area and observed the other police officer advise Geonnotti of his implied consent rights several times, reading a form verbatim and explaining the document in laymen's terms.  Officer Barry, who was the arresting officer, stated that the reason he asked the other police officer to advise Geonnotti of his implied consent rights and to see if he, Geonnotti, would submit to testing, was that he felt he would not get any cooperation.  (R.R. 10a, 11a).

about 5:30 p.m. After leaving the room, the police officer heard a loud exchange between Geonnotti and the police captain.

The police captain (Robinson) testified that upon his hearing a loud conversation ensuing between several police [3] and Geonnotti, he cautioned Geonnotti to keep his voice down, explained why the officer was trying to get him to take the test, and that he, Geonnotti, would lose his operator's license if he didn't take the test. Responding to Geonnotti's protest that he was being treated as a criminal, the police captain told Geonnotti that they would treat him as such if that is what he wanted and told an officer to place Geonnotti in the holding cell. For the first time, Geonnotti requested to speak with his attorney. Although the police captain honored Geonnotti's request that he be permitted to make a telephone call to his attorney, he made no call. The police captain testified that when talking to Geonnotti, his voice was louder than his conversational tone and admitted telling Geonnotti that he was acting like an asshole. (R.R. 124a).

At about 5:50 p.m., a second police officer (Schwab), knowing that the first officer failed, visited Geonnotti who was in the holding cell [4] and attempted to persuade him to submit to the breath test. He advised Geonnotti that refusal to submit to the test would cause a mandatory twelve-month driver's license suspension, but that if he took the test and failed, he would be eligible for accelerated rehabilitation and receive a thirty-day suspension. (R.R. 73a, 74a). Geonnotti told the officer that he would not take the test. (R.R. 71a). The officer also filled out a form

3. Officers Barry, Schwab and Sergeant Jones. (R.R. 118a).

4. An incident involving Geonnotti and this police officer occurred prior to their conversation in the holding cell when the police officer refused to shake the extended hand of Geonnotti because Geonnotti had written an unfavorable letter to the police captain involving the police officer. Officer Barry, the arresting officer, testified that he was not sure whether Officer Schwab asked him if he wanted Schwab to advise Geonnotti of the informed consent law or if he was the one who asked Schwab to try to get Geonnotti to take the test. (R.R. 105a).

indicating that Geonnotti had refused to take the test. The form was not signed by Geonnotti.

Almost immediately after the encounter with Officer Schwab, a police sergeant (Jones) entered Geonnotti's cell and again asked him to take the chemical test. The sergeant assured Geonnotti that the test would be administered fairly, and that he would be permitted to go home as soon as he completed the breath test. Geonnotti agreed to take the test. Geonnotti was then taken out of the cell by the sergeant and processed. After processing, Geonnotti questioned when he would be given the test. The trial court found that this occurred sometime between 6:10 p.m. and 6:30 p.m. Officer Barry, the arresting officer, refused to allow the test to be administered because too much time, about one and one-half hours, had elapsed between the time he stopped Geonnotti, learned that Geonnotti consented to the test, and the police could begin the test.

PennDOT notified Geonnotti that his driver's license was being suspended for a one-year period as a result of his refusal to submit to chemical testing to determine his blood alcohol content. Geonnotti appealed to the trial court. The court held a *de novo* hearing, and by order dated June 16, 1989, dismissed Geonnotti's driver's license suspension appeal. This appeal followed.[5]

■ On appeal, Geonnotti first contends that his due process rights were violated when the police did not administer a proffered breathalyzer test, even though he had refused to take the test in response to several other requests. Relying on a line of cases holding that a subsequent consent does not supplant the initial refusal,[6] Penn-

5. Our scope of review is limited to determining whether the trial court's findings are supported by competent evidence, whether an error of law has been committed, and whether the lower court's decision constitutes an abuse of discretion. *Commonwealth, Department of Transportation v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989).

6. PennDOT relies mainly on our decision in *Commonwealth v. O'Rourke*, 25 Pa.Commonwealth Ct. 580, 361 A.2d 496 (1976). In *O'Rourke*, the licensee requested to take the breathalyzer test some thirty to forty-five minutes after his arrest, at which time he had

DOT argues that once Geonnotti refused to take the breathalyzer, his later consent does not vitiate his earlier refusals. Geonnotti argues that those cases are inapplicable because they involved a spontaneous recantation, and not, as here, assent to a subsequent offer made by police to administer the test. While we agree with Geonnotti that those cases are not applicable, nonetheless, we find that Geonnotti's later assent did not supercede his earlier refusal.

The trial court properly found that Sergeant Jones' subsequent offer to administer the test did not supplant Geonnotti's earlier refusals. While Geonnotti does not set forth with specificity the nature of the due process rights he complains were violated, it appears that he believes that once Sergeant Jones made a subsequent offer and Geonnotti then consented, Geonnotti then has some sort of property right to have the test administered. By not administering the test, his substantive due process rights have not been violated and Geonnotti's position is not supportable.

The procedure followed by the police in processing Geonnotti for driving under the influence comported with due process. No obligation or property right existed requiring

refused to submit to the offered test. We found that the driver's subsequent consent to take the test did not supplant his previous unconditional refusal to submit to testing. Other refusal cases which PennDOT cites include *Appeal of Miller,* 79 Pa.Commonwealth Ct. 648, 470 A.2d 213 (1984) (police properly accepted a driver's refusal to take a breathalyzer as final when the driver was twice asked to take the test, informed of the consequence of refusing, twice refused, and then some 15 to 20 minutes later, changed his mind and assented to taking the test); *Department of Transportation, Bureau of Driver Licensing v. Tomczak,* 132 Pa.Commonwealth Ct. 38, 571 A.2d 1104 (1990) (troopers permitted to refuse the request of a driver who wanted to take a breathalyzer test after initially refusing to take the test because he failed to comprehend the ramifications of a refusal due to his extreme nervousness during the entire ordeal, even though he was initially advised of the consequences of not taking the test); and *Lane v. Department of Transportation,* 124 Pa.Commonwealth Ct. 246, 556 A.2d 12 (1989) (administration of a breath test in response to a driver's request twenty minutes after his release and return, did not vitiate a driver's earlier refusal to submit to a test when the driver, knowing of the consequences of failing to submit to a breath test, refused the test before his release and was advised that the subsequent test he requested would not be considered a legal test).

the administration of a second test, which would even give rise to a substantive due process violation. Even if the officer charged with processing the arrest had offered to allow a licensee a subsequent opportunity to be administered the test rather than an officer who had no official responsibilities in processing Geonnotti, such an offer is a matter of grace and can be revoked at any time up until the test is administered. *See Commonwealth, Dept. of Transportation v. Wroblewski,* 65 Pa.Commonwealth Ct. 333, 442 A.2d 407 (1982). Accordingly, since Geonnotti had no right to be administered a second test, his due process rights could not have been violated.[7]

■ Geonnotti also argues that his decision not to submit to the breathalyzer was not made knowingly or consciously, because of the hostility he encountered at the scene of his arrest and at the police station, including the name he was called by the police captain. This argument is disingenuous. The testimony reveals that the police were acting in a proper and appropriate manner, constantly attempting to persuade him to take the breathalyzer. No evidence exists of a hostile environment that could have affected in any way Geonnotti's ability to make a decision as to whether to take the breathalyzer test.

7. In *Marmo v. Commonwealth, Department of Transportation,* —— Pa.Commonwealth Ct. ——, 543 A.2d 236 (1988) (*Marmo I*), *upon reconsideration,* 121 Pa.Commonwealth Ct. 191, 550 A.2d 607 (1988) (*Marmo II*), a case not cited by Geonnotti, this Court addressed the issue of subsequent offers by police officers. In *Marmo I,* we stated that "where a police officer gratuitously offers a licensee a subsequent opportunity to take one of the chemical tests, the prior refusal is waived." 543 A.2d at 238. *Marmo's* facts show that this statement is dicta and not controlling.

In *Marmo I,* a licensee refused to take a breathalyzer at the police station, but offered to take a blood test at a hospital to which the police acceded. At the hospital, the licensee stalled reading the consent form, prompting the police to mark a refusal. At trial, PennDOT inexplicably conceded that this did not constitute a refusal, but the refusal at the police station justified the suspension.

In *Marmo I,* we found that there was no evidence presented to support a finding that he had, in fact, refused to take the first test. The comment then that a gratuitous offer as to vitiate the refusal was merely dicta.

■ Finally, Geonnotti contends that under *Department of Transportation, Bureau of Traffic Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989), his suspension cannot stand because he was not told that his right to speak with an attorney is inapplicable to a request that he take a breathalyzer. While ordinarily Pa.R.A.P. 302(a) would preclude an issue not raised below, there is an exception that where there is a major change in the law after the trial court's decision, then the issue may be raised on appeal. *See Kuchincic v. McCrory*, 422 Pa. 620, 626–27, 222 A.2d 897, 900 (1966); *Tice v. Nationwide Life Ins. Co.*, 284 Pa.Superior Ct. 220, 228, n. 7, 425 A.2d 782, 786, n. 7 (1981). Because *O'Connell* was decided after the entry of the court's order, we will address whether *O'Connell* applies.

Geonnotti was never given *Miranda* warnings prior to his refusal to take the breathalyzer (R.R. 25a) nor does he contend that he ever received such warnings. He only requested to speak with his attorney after he had already refused several times to be administered the breathalyzer. Because his request to speak with his attorney came after his refusal, and he was never given *Miranda* warnings, *O'Connell* instructions were not required.

Accordingly, we affirm the decision of the trial court to uphold the suspension of Geonnotti's operating privileges.

## ORDER

AND NOW, this 2nd day of April, 1991, the order of the Court of Common Pleas of Bucks County, No. 88–03043–09–06, is affirmed.