**James V. BURKE**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING, Appellant.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 5, 1999.

Decided June 8, 1999.

Reconsideration Denied Aug. 4, 1999.

Bryan S. Neiderhiser and Timothy P. Wile, Asst. Counsel In-Charge, Harrisburg, for appellant.

George A. Miller, Pittsburgh, for appellee.

Before FRIEDMAN, J., LEADBETTER, J., and LORD, Senior Judge.

FRIEDMAN, Judge.

The Department of Transportation, Bureau of Driver Licensing (DOT), appeals from an order of the Court of Common Pleas of Allegheny County (trial court) which sustained the appeal of James V. Burke (Licensee) from a one-year suspension of his operating privileges for refusing to submit to chemical testing pursuant to Section 1547(b)(1) of the Vehicle Code (Code).[1] We affirm.

On August 3, 1997, the pick-up truck Licensee was driving nearly collided with a stopped police car. (R.R. at 16a.) After Licensee's truck came to a stop, Officer Gary Krek of the Brentwood Borough Police Department approached Licensee and observed signs of intoxication. (R.R. at 16a–17a.) Officer Krek administered six field sobriety tests, five of which Licensee failed. (R.R. at 18a.) Licensee was arrested and transported to the police station.

At the police station, Police Officer Scott Harding, a certified intoxilyzer operator, read Licensee verbatim the chemical test warnings on DOT Form DL–26,[2] (R.R. at 35a–36a), which warnings Licensee understood. (R.R. at 52a–53a.) Officer Harding administered a breathalyzer test to Licensee, using the Intoxilyzer 5000. (R.R. at 34a–35a.)

Officer Harding conducted three separate breathalyzer tests on Licensee, for a total of six breath samples. (R.R. at 38a.) Officer Harding testified that the test requires two breath samples, with a maximum permissible deviation between the breath samples of .02. (R.R. at 37a–38a.) Because the deviation between Licensee's breath samples for each test was greater than .02, the intoxilyzer indicated "a reading of invalid sample." Officer Harding attributed the invalid samples to Licensee's failure to provide a steady stream of air into the intoxilyzer's mouthpiece.[3] (R.R. at 40a.)

After Licensee failed to give sufficient breath samples for the three breathalyzer tests, Officer Harding instructed Officer Krek to take Licensee to the hospital for a blood test. Officer Krek transported Licensee to the hospital and read Licensee

---

1. Section 1547(b)(1) of the Code provides for the suspension of a driver's license for a period of one year upon refusal to submit to chemical testing to determine blood alcohol content. 75 Pa.C.S. § 1547(b)(1).

2. The warnings provided on DL–26 satisfy the minimum requirements set out by our supreme court in *Department of Transportation, Bureau of Traffic Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989). *Department of Transportation, Bureau of Driver Licensing v. Ingram*, 538 Pa. 236, 648 A.2d 285 (1994).

3. Officer Harding explained that the intoxilyzer makes an audible tone and that he instructed Licensee to "give a steady stream of air into that tube, the mouthpiece, until that tone stops." (R.R. at 40a.) He testified that Licensee only blew into the tube for one or two seconds, despite the fact that he had instructed Licensee to blow into the mouthpiece until the tone stopped. (R.R. at 40a–41a.)

his warnings; Licensee willingly signed the DOT form indicating that he understood those warnings. (R.R. at 25a–26a.) Thereafter, a member of the hospital staff informed Licensee that he would have to sign a hospital consent form before his blood could be withdrawn. When Licensee refused either to read or to sign that form, his conduct was deemed a refusal of the blood test. (R.R. at 29a.) By letter of August 20, 1997, DOT notified Licensee that it was suspending his driving privilege due to his "CHEMICAL TEST REFUSAL on 8/03/97." (R.R. at 6a.) Licensee filed a timely appeal.

The trial court found that Licensee's failure to supply sufficient breath samples at the police station was vitiated for purposes of the determination of a refusal when the officers transported Licensee to the hospital for a blood test. (R.R. at 68a–69a.) With respect to the blood test, the trial court ruled that Licensee's refusal to sign the hospital form did not amount to a refusal to submit to the blood test.[4] (R.R. at 69a.) Consequently, the trial court sustained Licensee's appeal. DOT's appeal followed.[5]

To sustain a license suspension under section 1547 of the Vehicle Code, DOT must prove that the licensee (1) was arrested for driving under the influence of alcohol; (2) was asked to submit to a chemical test; (3) refused to do so; and (4) was specifically warned that refusal would result in the revocation of his driver's license. *Department of Transportation,* *Bureau of Driver Licensing v. Ingram,* 538 Pa. 236, 648 A.2d 285 (1994). Because here DOT undisputedly satisfied the first, second and fourth elements, the only question with regard to DOT's burden of proof is whether Licensee refused to take a chemical test. DOT argues that Licensee refused to submit to both the breath and blood tests; however, we conclude that, under the unique circumstances presented, DOT cannot establish that Licensee refused to take either of the tests.[6]

With respect to the blood test, the trial court ruled that Licensee's refusal to sign the hospital form did not amount to a refusal to submit to the blood test. (R.R. at 68a–69a.) We agree with the trial court.

Here, there is no question that Licensee initially consented to take a subsequent blood test. He willingly went to the hospital and signed DOT's form consenting to the test and indicating that he understood the warnings the officers had given him. (R.R. at 25a–26a.) However, the hospital did not conduct the blood test because Licensee refused to sign a hospital form. We agree with the trial court that Licensee's refusal to sign the hospital form did not constitute a refusal of the test, i.e., a revocation of his consent to take that test.

"Requiring a licensee to sign a form, of whatever nature, in order to consent to chemical testing, is beyond the parameters of § 1547 [of the Vehicle Code] which does not require a licensee to complete any pre-test procedure." *Depart-*

4. DOT argues that there was no evidence that the hospital form was a "consent" form or that it was a precondition to his submission to the blood test. Regardless of the type of form, requiring Licensee to sign *any* form in order to consent to chemical testing is "beyond the parameters of § 1547 which does not require a licensee to complete any pre-test procedure." *Department of Transportation v. Renwick,* 543 Pa. 122, 130–31, 669 A.2d 934, 939 (1996).

5. In driver's license suspension cases, our scope of review is confined to determining whether the trial court's factual findings are supported by competent evidence, and whether the trial court committed an error of law or an abuse of discretion. *Department of Transportation, Bureau of Driver Licensing v. Boucher,* 547 Pa. 440, 691 A.2d 450 (1997). Questions of credibility and conflicts in the evidence are for the trial court to resolve. *Ingram.*

6. Whether a licensee's conduct constituted a refusal of a chemical test is a question of law fully reviewable by this court. *Todd v. Department of Transportation, Bureau of Driver Licensing,* 555 Pa. 193, 723 A.2d 655 (1999).

*ment of Transportation v. Renwick,* 543 Pa. 122, 130–31, 669 A.2d 934, 939 (1996). Thus, a licensee's failure to sign a hospital form is not a *per se* refusal to chemical testing. *Id.* On the other hand, failure to sign a hospital form will constitute a refusal where the licensee has not given an unqualified, unequivocal assent to the test itself. *Id.*

■ Relying on *Renwick,* DOT argues that Licensee's overall conduct demonstrates his refusal of the blood test. We disagree. Although Licensee refused to sign, or even look at, the hospital form, his refusal related solely to the form; he gave an unqualified, unequivocal assent to the test itself.[7] Indeed, prior to the time the hospital staff told Licensee that he had to sign the form, Licensee had unqualifiedly and unequivocally agreed to submit to the blood test. Even after he refused to sign the form, Licensee restated his agreement to submit to the test. Licensee testified that, after he refused to sign the hospital form, he told the officers, "Take the blood; take the blood. I told the officer to take the blood." (R.R. at 54a.) This testimony was unrefuted. We therefore conclude that Licensee did not refuse the blood test when he refused to sign the hospital form.

■ With respect to the breath test, the trial court found that Licensee failed to supply sufficient breath samples during the test; nevertheless, the trial court concluded that Licensee's failure to supply sufficient breath samples was vitiated for purposes of the determination of a refusal when the officers' transported Licensee to the hospital for a blood test. We agree that Licensee's conduct with respect to the breath test was vitiated for purposes of a determination of a refusal but for reasons different from the trial court's.[8]

DOT argues that, because Licensee never actually completed the blood test, Licensee's refusal of the breath test is not waived. In making this argument, DOT relies on *Olbrish v. Department of Transportation, Bureau of Driver Licensing,* 152 Pa.Cmwlth. 423, 619 A.2d 397 (1992) and *Geonnotti v. Department of Transportation, Bureau of Driver Licensing,* 138 Pa.Cmwlth. 652, 588 A.2d 1343 (1991). According to DOT, those cases stand for the proposition that the prior refusal may not be waived **unless** the licensee successfully completes the subsequent test. Those cases, however, are distinguishable and, thus, do not control here.

The facts of *Olbrish* are similar to, but significantly different from, those of the instant case. In *Olbrish,* the licensee failed to supply sufficient breath samples during a breathalyzer test. The police officer told the licensee that his actions

---

7. In *Renwick,* the Court determined that, although the licensee's refusal to sign the consent form did not, in and of itself, constitute refusal to take the chemical test, her overall conduct demonstrated a refusal.

In considering Licensee's overall conduct, including the breathalyzer test, we observe that both Officers Krek and Harding testified as to Licensee's complete cooperation, with the exception of his failure to supply sufficient breath samples during the breathalyzer test. (R.R. at 20a–23a.) Officer Krek further testified that, even when Licensee refused to sign the hospital form, he did not become uncooperative. (R.R. at 22a.) Licensee's cooperation contrasts sharply with the conduct of the licensees in *Renwick* and *Copeland v. Department of Transportation, Bureau of Driver Licensing,* 678 A.2d 865 (Pa.Cmwlth.1996).

In *Renwick,* the licensee ignored the officers' repeated requests that she submit to a blood test. She turned her head away and closed her eyes when they questioned her. When asked to sign a form, she said that she could not lift her arm; yet she signed a hospital treatment form shortly thereafter. Our supreme court described her conduct as "gamesmanship." In *Copeland,* the licensee refused to sign any forms unless his lawyer was present and specifically refused to take a blood test due to a fear of needles. Moreover, at no time did the licensee agree to take the test without signing the forms.

8. It is well settled that we may affirm on different grounds where we agree with the result reached by the tribunal below. *Beverly Enterprises, Inc. v. Unemployment Compensation Board of Review,* 702 A.2d 1148 (Pa. Cmwlth.1997).

constituted a refusal and in fact, *at that time*, deemed the licensee's inability to supply sufficient breath samples a refusal. Nevertheless, the police officer, explaining that he was "trying to be fair," asked the licensee to take a blood test. The licensee agreed, but refused to sign a hospital consent form. The trial court concluded that the licensee's failure to supply sufficient breath in the first test constituted a refusal. We agreed, after first determining that the police officers had in fact "promptly informed" the licensee that his actions constituted a refusal of the first test. *Id.* at 399.

Similarly, in *Geonnotti*, the licensee failed to provide sufficient breath samples on two breathalyzer tests and the officers treated his conduct as refusals. In fact, the officers not only told the licensee the consequences of those refusals, they also completed forms indicating that the licensee had refused the tests.

*Olbrish* and *Geonnotti* are distinguishable from the instant case because in those cases the police officers promptly treated as a refusal the licensee's conduct with respect to the initial tests. Here, in sharp contrast, Officer Harding did not treat or deem Licensee's failure to supply sufficient breath samples as a refusal. Following Licensee's failed breathalyzer tests, Officer Harding did not complete any forms reflecting Licensee's refusal and did not inform Licensee that his conduct constituted a refusal.

Officer Harding testified that, as a certified intoxilyzer operator, his duties include determining whether a person has refused the test for failure to provide a sufficient breath sample. (R.R. at 43a.) Although Officer Harding acknowledged that he had authority to deem Licensee's failure to provide sufficient breath samples a refusal, he stated that he chose not to do so in Licensee's case. (R.R. at 38a.) In fact, he "deemed it **not** to be a refusal." (R.R. at 44a) (emphasis added). Giving Licensee "the benefit of the doubt," [9] Officer Harding instructed Officer Krek to take Licensee to the hospital for a blood test. (R.R. at 38a, 44a.) We decline to do now what Officer Harding explicitly chose not to do at the time of the test.

We recognize that a police officer's offer to administer a subsequent test "is a matter of grace and can be revoked at any time up until the test is administered." *Geonnotti*, 588 A.2d at 1346. *Accord, Olbrish.* However, here the police officers did not revoke the subsequent offer of a blood test. Rather, the record reflects that, although the hospital attached an impermissible precondition to the blood test by requiring Licensee to sign a form, the officers at no time revoked the subsequent offer of a blood test. Thus, that offer remained open.

Accordingly, because Officer Harding, at the time of the breath test, specifically deemed Licensee's conduct not to be a refusal,[10] because the trial court did

---

9. Although Officer Harding testified that the breathalyzer machine was in working order (R.R. at 41a), his actions belied that contention. Instead, his testimony reflects that he was not sure that the intoxilyzer was not malfunctioning and for that reason gave Licensee "the benefit of the doubt." He testified that, "just to make sure," he removed the machine from service and had it recertified. (R.R. at 40a.) We recognize that DOT's regulations at 67 Pa.Code § 77.24(b) require intoxilyzers to be removed from service and recertified where the difference between the results of two actual breath tests is .02 or more. However, those regulations require removal from service and recertification only where two **actual** breath tests vary by more

than .02. *See Department of Transportation, Bureau of Driver Licensing v. Pestock*, 136 Pa.Cmwlth. 694, 584 A.2d 1075 (1990), *appeal denied*, 528 Pa. 619, 596 A.2d 801 (1991); *Commonwealth v. Mabrey*, 406 Pa.Super. 437, 594 A.2d 700 (1991). Because insufficient breath samples are not **actual** breath tests, they do not require that the machine be removed from service and recertified. *Pestock, Mabrey.* Thus, Officer Harding's actions in removing the machine from service and having it recertified reflect his own doubt that the machine was functioning properly.

10. With respect to the breathalyzer test, our holding is narrow. We do not hold that offi-

not determine that Licensee's insufficient breaths constituted a refusal and because the officers did not expressly revoke their offer of a subsequent blood test, we will not examine Licensee's conduct with respect to the breath test to determine whether it constitutes a refusal. For those reasons and because Licensee did not refuse the blood test, we affirm the trial court's order.

## ORDER

AND NOW, this 8th day of June, 1999, we affirm the order of the Court of Common Pleas of Allegheny County, dated December 11, 1997.

LEADBETTER, Judge, dissenting.

I respectfully dissent. I believe that whether or not a licensee has refused a chemical test is a question of law for us to determine based upon the licensee's conduct as found by the trial court. Whether the police "deem" that conduct to be a consent or refusal is irrelevant unless they communicate that view to the licensee and thereby in some manner alter his subsequent behavior, a situation not presented here. Accordingly, on the basis of *Olbrish v. Department of Transportation, Bureau of Driver Licensing*, 152 Pa.Cmwlth. 423, 619 A.2d 397 (1992), I would reverse the order of the court of common pleas and reinstate the suspension.

cers are required to complete forms indicating that a licensee has refused to take a test so as not to waive a future determination of refusal. Indeed, in *Olbrish*, we explained that a formal recordation of a refusal was not required. We merely hold that where, at the time of the test, the officer deems the licensee's conduct *not* to be a refusal and offers the licensee the opportunity to take another test and does not revoke that offer, any prior refusal is vitiated.